## HAMILTON v. NATIONAL LIFE & ACCIDENT INS. CO.

### No. 1108.

Court of Appeal of Louisiana. First Circuit.

March 7, 1933.

Ped C. Kay, of De Ridder, for appellant.

Hawkins & Pickrel, of Lake Charles, for appellee.

ELLIOTT, Judge.

Calvin L. Hamilton obtained from the National Life & Accident Insurance Company an insurance policy against bodily injury, and alleges that, while working as a laborer on highway No. 104 in Cameron parish on July 26, 1930, and while lifting a box of bolts, he sustained an injury within the terms and protection of his policy, and that the insurance company refuses to pay him.

The National Life & Accident Insurance Company alleges for defense that it was induced to enter into said contract as the result of a deliberate, intentional, and malicious fraud, practiced upon it by the plaintiff; that the injury which plaintiff has was not received while the contract was in force, but existed prior thereto. It prays that his demand be rejected, but, in the event it is held that he is entitled to recover, then, in that event and alternative, it alleges that the injury which he sustained comes within the terms and provisions of a clause in the policy which limits his recovery to half of the amount claimed, and that for a period of six months only.

There was judgment rejecting plaintiff's demand. He applied for, and was granted, a new trial. On the new trial, his demand was again refused. He then appealed, and urges that the judgment rejecting his demand be reversed, and that judgment be rendered in his favor as prayed for in his petition.

For some reason not explained, it appears from the note of testimony that, on the trial of this case, the defendant, contrary to the rule formulated by the Code of Practice, arts. 476 and 477, introduced its evidence first, and, after it had closed in chief, the plaintiff then introduced his evidence. It may be that the ruling of the court, permitting defendant by its witness A. M. Mutersbaugh to discredit the testimony of Clifford Reeves, which the defendant had caused to be taken by commission, had something to do with it. As a preliminary to the review of the rulings mentioned, we will state that A. M. Mutersbaugh, Inc., had the contract for building the highway mentioned, and A. M. Mutersbaugh was its president, and presumably its general manager. Reeves, its superintendent and foreman in road work, had

518

power and 'authority to discharge laborers, subject, it seems, to the supervision of Mutersbaugh. The plaintiff, Hamilton, was employed and was working on the road at the time of his alleged injury, under the authority of Reeves.

The plaintiff urges that the lower court erroneously permitted A. M. Mutersbaugh, witness for defendant, to testify to statements and to a request made on him by Reeves concerning plaintiff and his capacity and willingness to do the labor and lifting necessary in the road work which he says Reeves made to him previous to the time of the alleged injury. The purpose of the testimony was to discredit the testimony which Reeves had given under the court's commission in answering the questions propounded to him by the defendant and the plaintiff on that subject.

Reeves, in answering the questions propounded to him, made statements highly favorable to the plaintiff. His testimony was returned into court, and was, of course, open to inspection and reading by both sides. And the statement made by the court, in ruling on the objections urged by the plaintiff, shows that the court was also aware of the situation in that respect. He said in ruling on the objection: "This testimony is admitted solely for the purpose of impeaching the testimony of the witness who gave his testimony by deposition." As stated preliminarily, defendant was offering testimony at the time the objection was made, but had not and never did offer the testimony of Reeves, and we may as well add that, when the plaintiff came to offer evidence, he offered the testimony of Reeves in support of his demand, as defendant, and the court could well suppose in advance that he would do so.

A party cannot be permitted to discredit his own witness on the trial of the case without first giving him an opportunity to explain himself.

Plaintiff states in his brief: "It will be noted that defendant was permitted to place the witness A. M. Mutersbaugh on the stand to impeach its own witness Reeves, whose testimony had been taken before the trial under commission, without giving plaintiff any warning of its intention to impeach and before said witness's testimony had been introduced, and the witness Mutersbaugh was permitted to make statements as to what Reeves told him over objections of plaintiff." Plaintiff's contention is not well founded because the defendant had not and never did offer in evidence the testimony of Reeves, but, after the defendant had closed in chief, the plaintiff offered it in evidence.

A party to a suit may summon a witness and have him in court at the time of trial, but he is not obliged to put him on the stand and use him as a witness. In such a situation, if the opposite sees proper to call him to the stand, he makes the witness his own.

Our conclusion is that Reeves should not be regarded as defendant's witness, but as plaintiff's witness; consequently the rule which prevents a party from impeaching his own witness without giving him an opportunity to explain does not apply.

The defendant, interrogating its witness Mutersbaugh for the purpose of discrediting the testimony of Reeves, was therefore properly permitted to ask him whether or not Reeves had applied to him some time before the alleged occurrence for permission to discharge the plaintiff Hamilton on the ground that he was unable or could not do the work the other men were doing on the job.

The answers of Mutersbaugh, if true, served to discredit the answers which Reeves had given in response to the questions, which had been asked him under the commission which had been obtained and returned into court, and the defendant and the court, because of the nature of same, could, we think, safely assume at that time that the plaintiff would later offer same in evidence. The mode of procedure gave defendant the right at this time to discredit Reeves.

While Mutersbaugh was on the stand testifying as stated, he was handed by defendant what purported to be a typewritten copy of a letter, written by Reeves to A. M. Mutersbaugh, Inc., concerning plaintiff's alleged injury and his work, etc. Mutersbaugh says that, when he received the original from Reeves, he sent it to the Southern Casualty Company. The Southern Casualty Company, it appears, carried the compensation insurance on A. M. Mutersbaugh, Inc., in connection with the road work in question. This seems to be the last and only time that Mr. Mutersbaugh saw the original letter.

The testimony of Mutersbaugh and that of Mark O. Pickerel, attorney for defendant, taken together, shows, we think, satisfactorily that the original letter is not within the reach, power, nor control of defendant; that defendant tried to get possession of it, but was unable to do so. In such a situation, a true copy may be offered, and the evidence of Mutersbaugh is to the effect that the copy produced is a true and correct copy of the original. The lower court therefore properly received the copy in evidence, as it was the best evidence obtainable on the subject by defendant.

The plaintiff testified on the trial:

That he went to work for A. M. Mutersbaugh, Inc., about July 7, 1930; that he had been operated on for hernia about thirteen years previous to the time of the trial, and was cured at that time. That he had since then performed hard manual labor, such as carrying green cross-ties and other lifting work for different employers, and suffered no

return of his former trouble. That while working for A. M. Mutersbaugh, Inc., on July 26, 1930, he sustained the present injury.

That about three years before commencing to work for A. M. Mutersbaugh, Inc., he was examined as to his physical fitness for manual labor, was found all right, and given work that required hard labor, lifting, etc. That he was injured about 9 or 10 o'clock a. m. trying to lift a box of bolts. That he felt at the time a stinging burning sensation at the place where the hernia has appeared. That he mentioned the matter at the time to Mr. Reeves and some of the hands, one of whom he remembered was Dick Silvia. That, after feeling the injury, he continued to work until noon; but in later statements said he managed to get by until noon. That he told some of the hands that he did not think he would come back. That after quitting work on the road at noon he came back to Lake Charles with the other hands in vehicles provided for the purpose, and remained there until night and then took the train for Merryville, where he lived. That he walked from the depot in Merryville to his home; stayed at home that night, which was Saturday night, all day Sunday and Sunday night, and about 8 o'clock a. m. Monday morning went to see Dr. Frazer in Merryville, who examined him and found the hernia. That he obtained from Dr. Frazer a certificate showing his injury, he then took the train, and came back to Lake Charles, arriving at Lake Charles while the men were getting ready to go to work, meaning, so we understand it, work on the road at the place where they left off on Saturday at noon. That Mr. Reeves did not live in town, so he went to his house:

"Q. What did he say, if anything, at that time? A. I walked up and he told me 'You had better get in that car and go with them' (meaning, as we understand it, to work on the road where they had left off Saturday at noon).

"Q. What did you do? A. I told him I did not guess I was going, and handed him this slip.

"Q. What did he do then? A. Took it to Mr. Mutersbaugh.

"Q. What did he tell you? A. Told me to go to Dr. Holcomb.

"Q. You say you examined it about 2 or 3 o'clock in the afternoon? A. Not until I quit work. I did not have to look at it, I could feel it."

He further stated that he was satisfied in his own mind at the time that he had sustained a hernia; that he sat down for a short time when he first received it, then got up and managed to get by and make it through until noon.

Dr. Frazer testifies that he examined plaintiff in July, 1930, in his office in Merryville

and found him with a hernia. In response to questions whether it was an old or a new injury, he expressed the opinion that it was a new one, basing his opinion in that respect on history and physical symptoms at the time of the examination; that an injury of the kind might not be accompanied by severe pain when first received; that the pain would not last very long; it is when it opens up that causes the pain; that a man with hernia could do some work where he did not lift a great deal.

"Q. Could this man stand up all day in his present condition? A. Oh Yes, I imagine, without any physical effort or strain on him.

"Q. And he could have done so if the condition existed prior to the time he claims to have had the injury? A. If the condition had existed exactly the same.

"Q. Could a man who had received a hernia by lifting a heavy object continue to do manual labor for half a day after the injury? A. I doubt if he could; he might have strained himself, but it is not probable, not heavy work.

"Q. Then if this man had hernia the same as it was when you saw him, he is bound to have suffered excruciating pain? A. Yes.

"By the Court: Q. Did you say if a man had a hernia at 9:30 or 10 o'clock A. M. that it would be your opinion he could not work the rest of the day? A. If he is doing heavy labor he could not.

"Q. Would you think he could do light manual labor? A. Yes, it is possible, if he did not get himself in another strain. Of course he is going to have some pain. If that retracts back that lessens his pain."

Dr. Love examined plaintiff about three days before the trial took place, which was about fourteen months after the alleged injury. He stated that plaintiff was not able to do hard work in the condition he was in; that an injury of the kind causes sudden pain, but not necessarily extreme, bad pain. He did not think that a man with an injury such as plaintiff had could have continued doing heavy work. But, upon the whole, he inferentially says that he might have continued to do light work; that it depended on the hernia he had received.

Dr. Holcomb testified that he examined plaintiff on August 1, 1930. This was about three days after he had been examined by Dr. Frazer.

Dr. Holcomb was in defendant's employment. He testified:

That he found plaintiff with a well-advanced inguinal hernia, recurred from a former operation. That there existed a sac, so large that such a sac could not have developed as the result of an injury such as plaintiff had, if same had been sustained on July

26, 1930; that is, five or six days previous to the time of the examination.

That the injury he found plaintiff to have had not, in his opinion, been recently sustained, but was in existence previous to July 26, 1930, but as to the length of time it had existed he did not say. He testified that a man sustaining a hernia by lifting a heavy weight could not have continued to do manual labor for a half day afterwards.

Cross-interrogatory No. 4: "Q. Is it not a fact in case of hernia, that one is able to work after receiving an injury, in certain cases? A. Yes, especially where an unknown or known hernia has pre-existed."

Clifford Reeves, in answering the questions propounded to him by the parties to the suit, says that the plaintiff Hamilton had been employed, it seemed to him, like a couple of months previous to July 26, 1930; that he was never discharged, and did not quit voluntarily; he merely said he hurt himself; that he did the same kind of work as the other men did, working on the job; that he was a good and efficient workman; that on July 26, 1930, he saw him move a box of bolts, and after doing so said he had hurt himself.

That plaintiff continued to work until noon and then caught a ride in, he was not sure (meaning to Lake Charles), but could not do his work as well after he was hurt as he had done before.

The testimony of Dick Silvia, an employee on the same work at the same time, is corroborative of the testimony given by Reeves.

The plaintiff paid the premium, $2.80, for the insurance on July 21, 1930, which under the terms of the policy put it into effect.

The policy was issued July 24, 1930, and must have reached the plaintiff about the time of, or very soon after, his alleged injury.

On Monday July 28, 1930, at about 8 o'clock a. m., the plaintiff was examined by Dr. Frazer at Merryville. Several hours later during the same day he was examined by Dr. Holcomb. The examination made by Dr. Holcomb was in connection with a demand for compensation which the plaintiff had made on A. M. Mutersbaugh, Inc., on reaching Lake Charles Monday morning, on account of his hernia.

The evidence shows that he received $350 as compensation on said account.

The judge a quo took into account the fact that only six or seven days had elapsed after the alleged hernia, at the time Reeves made his report to A. M. Mutersbaugh, Inc., and that about fourteen months had elapsed after the alleged occurrence before his testimony was taken by commission. The conflict between his report of August 19, 1930, and his testimony taken on September 30, 1930, admits of no reconciliation.

We reproduce the copy of the letter which Reeves wrote to A. M. Mutersbaugh, Inc., as follows:

"Lake Charles, La., August 19, 1930.
"A. M. Mutersbaugh, Inc.
"Attention Mr. A. M. Mutersbaugh, President:

"Dear Sir: As requested by you I give you the information relative to the alleged injury to Luther C. Hamilton, which he claims he suffered while working on the Sulpher-Cameron Highway under my supervision.

"As your superintendent on this job I wish to state that this man merely turned over a box of bolts in order to get them out of the way, where they were shoveling, in order that the box of bolts would not be covered over with dirt. This party mentioned to me that he believed he hurt himself while turning the box of bolts over, but nothing was thought of it either by him or by me, and he continued performing his work in a regular way without complaining at all until at noon, when we knocked off from work to go back to town, as the day he alleged he hurt himself was on Saturday and he had no further work to do until the following week.

"I wish to state however, that I advised him at noon on this day that I would not need him any longer, as the job was completed as far as his kind of work was concerned, as I had noticed some time before, that this man could not do any heavy lifting, therefore was of no especial benefit to me as a workman.

"I absolutely feel that this man was not injured on this job, and due to my observation covering the period of his employment I noticed that he would not lift weights that ordinary workmen could lift; therefore I felt that the injury he alleged to have received on this job, he already had, and was not sustained while under my employment.

"Hoping this report fully meets your requirements, I am, superintendent on the job,
"Clifford Reeves."

The language of the judge a quo in stating his reasons for judgment shows that he looked on the testimony which Reeves had given under the commission from the court, as so discredited by his statement in this letter, that he practically disregarded his testimony. He also gave no weight to the testimony of the plaintiff nor to that of Dick Silvia. He attached weight to the opinion of Dr. Holcomb, although he was in the actual service and therefore presumably receiving payment from the defendant.

Plaintiff testifies that, when he reached Lake Charles Monday morning, he went to the residence of Reeves, and Reeves, upon seeing him, told him, "You had better get in that car and go with them" (meaning, so we understand, out with the other men to re-

sume work on the road). Reeves admits this. He says that, when plaintiff returned to Lake Charles Monday morning, before presenting him (Reeves) with the report from Dr. Frazer, he (Reeves) pointed out to plaintiff a car and asked him to get into it and be transported to where his crew was working.

Such a suggestion indicates that Reeves did not understand, before getting the certificate from Dr. Frazer, that plaintiff had sustained an injury on the previous Saturday sufficient to incapacitate him from doing the same work on the road that he had been previously doing. Otherwise such a suggestion would not have been made.

We take it that plaintiff made complaint as he says he did and as stated by Reeves and Silvia, but, if plaintiff had received injury, such as he claims to have received, about 9 or 10 o'clock a. m. on Saturday as the result of lifting a heavy weight, we do not believe that he would have pursued the course he did. He went in some conveyance at noon from the place where he had been working to Lake Charles; the distance does not appear, but it was likely only a few miles. He was bound to have known that there are physicians in Lake Charles, but he remained there the whole of Saturday evening, and did not consult any of them. About dark he took the train for Merryville. When he reached there, he went home. He did not consult a doctor that night. He does not speak of having suffered any pain or inconvenience that night, nor the next day, which was Sunday. He remained at home all day Sunday, and did not consult a physician until Monday morning about 8 o'clock. Upon getting a certificate from Dr. Frazer, he forthwith took the train back to Lake Charles, and, upon getting there, lost no time in making demand on Mutersbaugh, Inc., for compensation.

It does not seem to us to be consistent with the testimony of the physicians, those called by him as well as of the one called by the defendant, that plaintiff, after receiving a sudden trauma of the kind described, could have acted, moved about, and showed ability to handle himself just as well after the injury as before. It appears to us to be a proper inference from the established facts that plaintiff was physically able to return to work on the road Monday morning and do the same work he had been doing from the time he engaged in that employment. Evidently the hernia had existed prior to the time he claims it was sustained, and it had ceased to pain him. He had been getting by, we think, by doing light work at whatever he was engaged in, since sustaining the injury, and by avoiding heavy lifting.

We are unable to say that the lower court erred in rejecting plaintiff's demand.

Judgment affirmed.